DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Sharon French appeals from the decision of the Wayne County Court of Common Pleas, juvenile division, which permanently terminated her parental rights and granted permanent custody of her son Shaun to the Wayne County Children Services Board. This court affirms.
 I.
Sharon French was thirty-seven years old when she married Richard French on June 14, 1986. Sharon had graduated from a business college, and worked in data entry for all of her adult life. On December 29, 1986, the couple's only child Shaun was born. Sharon and Richard soon separated and they divorced on September 16, 1988. Richard later moved to Michigan and remarried. Richard had little contact with Shaun when the boy was growing up. After the divorce, Sharon and Shaun moved into the Ottawa county home of Sharon's foster parents, who had raised Sharon since she was fourteen months old. Except for a brief period of time when Sharon and Shaun lived in Wooster, they lived with Sharon's foster parents. In fact, Sharon lived with her foster parents for most of her life.
According to Sharon, she had difficulty in disciplining Shaun from his early years. Shaun was diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD) and Asperger's syndrome, a mild form of autism that interferes with a child's ability to relate to other people. Sharon was very actively involved in getting assistance for Shaun in school. As Shaun got older, his behavior problems grew worse and Sharon was unable to effectively discipline him. Shaun had difficulty developing friendships, he was bullied by his classmates, his school attendance was poor, and he had poor grades. Sharon complained that Shaun did not obey her, and that when she confronted him Shaun sometimes became violent toward her.
At one point, Sharon and Shaun were involved with the Ottawa County Children Services Board (CSB), due to Shaun's violent episodes. On March 3, 1997, temporary custody of Shaun was awarded to Ottawa County CSB, and Shaun was placed in the Christian Children's Home in Wayne county. This placement was extended on February 25, 1998, and Sharon decided to move to Wooster so she could be close to Shaun. When Ottawa CSB discovered that Sharon had moved out of the county, the agency terminated its involvement with the family on September 25, 1998.
Shaun left Christian Children's Home and moved into Sharon's apartment in Wooster. Problems began almost immediately, and Sharon called the Wayne County CSB to assist the family. A voluntary case plan was developed, but Sharon felt that CSB viewed her as a negligent parent, and she terminated her involvement with CSB. However, in January 1999, Sharon was hospitalized for chest pains, and CSB took temporary care of Shaun. A second voluntary case plan was developed, directed at Shaun's school attendance problems and the domestic violence issues. Sharon continuously requested that Shaun be placed in a residential treatment facility. CSB declined to make such a placement, but provided intensive Home Based Intervention services, to help mother and son develop better discipline and coping skills. CSB also provided Sharon with individual counseling for depression and kleptomania.
However, Sharon was still not satisfied with the progress through CSB and requested the agency to place Shaun in a residential treatment facility. Shaun continued to have excessive unexcused absences from school, and on July 8, 1999, CSB filed a complaint alleging that Shaun was dependent due to the unexcused absences. A few days later, Sharon reported to CSB that Shaun came at her with a knife. At the adjudicatory hearing on July 23, 1999, all parties stipulated that it was in Shaun's best interest to be placed in the temporary custody of CSB, and to be placed in a foster home. The court appointed a guardian ad litem for Shaun. The next day, Sharon was arrested for breaking and entering and theft, for taking money from a safe in a store in Holmes county. Sharon later testified that she was so upset that Shaun was no longer living with her that she lost control and committed the theft. Sharon pled no contest to the charges and was sentenced to seventeen months imprisonment in the Ohio Reformatory for Women (ORW) in Marysville. In addition to the Holmes county sentence, Sharon's probation was revoked and sentences imposed for prior theft convictions in Wayne county and Lucas county.
Prior to Sharon's arrest and incarceration, CSB had established a case plan with the goal of reunifying Sharon and Shaun. The case plan required Sharon to: have a psychological evaluation and participate in the recommended psychological treatment; attend parenting classes; secure appropriate housing; and contact the Bureau of Vocational Rehabilitation for employment placement. Once Sharon was incarcerated, some changes were made to the case plan.
Shaun was placed in a stable foster home, with two foster parents who had raised four children of their own. Shaun was the only child in the home. The foster parents had never had a foster child previously. However, the foster parents were successful in establishing discipline, requiring Shaun to perform daily chores, to do his homework, to attend school daily, and to establish friendships at school and in the neighborhood. With some prompting, Shaun chose to become involved in extracurricular activities at school. His grades improved and he had no unexcused absences from school. Although Shaun had been on medication for ADHD, he was taken off the medication and after careful monitoring it was determined that Shaun did not need the medication.
On June 8, 2000, CSB moved for permanent custody as required by R.C.2151.413 and 2151.414(B), because Shaun had been in custody of the agency for twelve months in a continuous twenty-two month period. On July 27-28, 2000, the court held a permanent custody hearing. Sharon, Shaun, and Sharon's foster mother Evelyn Helle testified. Several CSB caseworkers also testified, as well as both Shaun's and Sharon's individual therapists, and Shaun's foster mother.
On August 24, 2000, the court granted permanent custody of Shaun to CSB and permanently terminated the parental rights of Sharon and Richard French. Sharon filed the instant appeal, and she assigns three errors.
 II. ASSIGNMENT OF ERROR I: IN TERMINATING SHARON FRENCH'S PARENTAL RIGHTS, AFTER SHE HAD BEEN DENIED ANY MEANINGFUL OPPORTUNITY TO PARTICIPATE IN THE MANDATORY REUNIFICATION EFFORT AND AFTER THE AGENCY HAD PERMITTED, AND EVEN ENCOURAGED, THE WEAKENING OF THE MOTHER-CHILD BOND, THE COURT BELOW DEPRIVED SHARON FRENCH OF HER RIGHT TO PROCEDURAL DUE PROCESS, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 ASSIGNMENT OF ERROR II: IN TERMINATING SHARON FRENCH'S PARENTAL RIGHTS, WHERE THERE WAS NO EVIDENCE THAT SUCH ACTION WAS URGENTLY NEEDED, OR WAS EVEN NEEDED AT ALL, THE COURT BELOW DENIED SHARON FRENCH HER RIGHT TO SUBSTANTIVE DUE PROCESS, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 ASSIGNMENT OF ERROR III: IN TERMINATING SHARON FRENCH'S PARENTAL RIGHTS, AFTER SHAUN WAS PLACED INTO FOSTER CARE TO ADDRESS HIS OWN BEHAVIORAL PROBLEMS AND PURSUANT TO A CASE PLAN WITH THE STATED OBJECTIVE OF REUNIFICATION, AFTER SHARON WAS NOT ALLOWED ANY VERBAL CONTACT WITH HER SON FOR OVER ONE YEAR, AND WHERE THERE WAS NO ATTEMPT TO INFORM HER AS TO THE TREATMENT AND BEHAVIORAL MODIFICATIONS THAT HAD EFFECTED IMPROVEMENT IN SHAUN'S CONDITION, THE COURT BELOW DISREGARDED OHIO LAW REQUIRING THE AGENCY TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT IT HAD MADE REASONABLE EFFORTS TO REUNIFY A PARENT AND CHILD.
Sharon's assignments of error are considered together, as they challenge the appropriateness of the trial court's decision, given the statutory mandates and constitutional protections involved in the termination of parental rights.
Although parents are entitled to have the care and custody of their children, the state may terminate such parental rights in the last resort where the best interest of the child requires such a termination. In re:Thompson (Jan. 10, 2001), Summit App. No. 20201, unreported, at 4. R.C.2151.414 governs the permanent termination of parental rights and responsibilities. Before a trial court may permanently terminate parental rights, the court must find that there is clear and convincing evidence both (1) that a grant of permanent custody to the state agency is in the child's best interests, pursuant to R.C. 2151.414(D), and (2) that the child cannot be returned to the parent for one of four reasons outlined in R.C. 2151.414(B)(1). R.C. 2151.414(A) and 2151.414(B)(2). If there is not clear and convincing evidence as to both the best interest and the inability to return the child to the parent, the trial court may not permanently terminate parental rights.
 When an appellate court reviews the weight of the evidence [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.
State v. Martin (1983), 20 Ohio App.3d 172, 175. This also applies to permanent custody cases. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. The trial court's decision will not be reversed unless the evidence weighs heavily against the judgment. State v. Ali
(Apr. 28, 1999), Summit App. No. 19119, unreported, at 9.
 A. Best Interest of the Child
Sharon's second assignment of error claims that there was no evidence that permanent custody was "urgently needed, or was even needed at all." However, the standard for consideration is whether permanent custody is in the best interest of the child. R.C. 2151.414(D) provides that:
 In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
The trial court conducted an in camera interview with Shaun. Shaun stated that he did not want to return to his mother's home, and that he wanted CSB to have permanent custody. The trial court asked Shaun if he understood that a grant of permanent custody did not guarantee that he would continue to live with his current foster family. Shaun stated that he understood that his current foster placement might change over time, and that he might ultimately be sent from one foster home to another, or even placed in a residential care facility until he turned eighteen. Shaun said that notwithstanding the uncertainty of future placements, he still wanted his mother's parental rights terminated. Shaun had made such statements to his therapist, his caseworker and his foster mother.
Although Shaun had lived most of his life with his mother, he experienced problems living with her. Although Shaun had numerous behavior problems including episodes of domestic violence against his mother, once he moved into the foster home Shaun adapted quickly and became a model child. He developed friendships and extracurricular interests. Shaun's therapist testified that Shaun had a bond with his mother, but it was a negative bond. The relationship was more like a troubled sibling relationship. Shaun did not want to communicate with his mother after she was incarcerated, in part because when Sharon did communicate with Shaun by letter, she tended to blame him for their separation and her incarceration. Not only was this upsetting to Shaun, but the allegations had no basis in reality. Shaun was thirteen years old at the time of the permanent custody hearing, and it was clear from his statements to the court that he had considered the alternatives to permanent custody.
The guardian ad litem also submitted her report just prior to the incamera interview, which occurred just prior to the permanent custody hearing. In her report, the guardian stated that in her opinion permanent custody was in Shaun's best interest, despite the fact that she was not certain Shaun understood the ramifications of permanent custody. At the hearing, the guardian questioned those who testified as to Shaun's desire to have permanent custody granted, to determine whether he in fact understood the ramifications of that alternative. The evidence presented at the hearing and Shaun's statements in the in camera interview indicate that Shaun was reasonably apprised of what placement options may occur if permanent custody was granted.
Furthermore, Shaun had been in custody of CSB for more than twelve months of a consecutive twenty-two month period. Sharon herself testified that she did not expect to be able to care for Shaun for six to twelve months following her release from prison, which was not anticipated to occur until August 2001. This would mean that Shaun could not be reunited with Sharon until sometime between December 2001 and August 2002, when Shaun would be fifteen years old.
Although a grant of permanent custody was not necessary to secure a permanent placement for Shaun, the trial court had before it clear and convincing evidence that a grant of permanent custody was in Shaun's best interest. This court cannot determine that the trial court's decision on this issue created a manifest miscarriage of justice. Sharon's second assignment of error is overruled.
 B. Return to the Parent
Sharon's third assignment of error states that the trial court failed to require CSB to prove by clear and convincing evidence that it had made reasonable efforts to reunify Sharon and Shaun. This court disagrees.
R.C. 2151.414(B)(1) mandates that there must be clear and convincing evidence that the child cannot be returned to the parent, due to one of the circumstances listed in R.C. 2151.414(B)(1). These circumstances are:
 The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
The child is abandoned.
 The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
The evidence was uncontroverted that Shaun had been in the temporary custody of CSB for twelve months in a consecutive twenty-two month period, from July 23, 1999 to the time of the permanent custody hearing on July 27, 2000. Thus, pursuant to R.C. 2151.414(B)(1)(d), Shaun could not be returned to Sharon.
The circumstance described in R.C. 2151.414(B)(1)(a) also applied to Shaun's situation, because there was evidence that Shaun could not be placed with his mother within a reasonable time, pursuant to R.C.2151.414(E). See R.C. 2151.414(B)(2). R.C. 2151.414(E) provides, in relevant part:
 In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
* * *
Any other factor the court considers relevant.
Sharon's first and third assignments of error focus on R.C.2151.414(E)(1), and she argues that CSB failed to prove that the agency used reasonable efforts to reunify mother and son. Sharon claims CSB failed to modify the case plan submitted to the court prior to her incarceration even though the fact of her incarceration required modification of the case plan to assist her in achieving reunification.
The case plan initially called for Sharon to get stable housing; that was changed to allow Sharon to get housing within fifteen days following release from prison. The plan was changed to allow Sharon to have supervised visits with Shaun in prison. However, the guardian ad litem
determined that such visits were not in Shaun's best interest, and it is clear from Shaun's testimony that he desired no contact with his mother after he was placed in foster care. A CSB caseworker acknowledged that the agency did not make any effort to assist Sharon to get the required psychological evaluation or follow-up treatment in prison. Sharon now says that because CSB failed to offer alternative services to her while she was imprisoned, the agency precluded her from reaching the case plan goals. However, Sharon's own testimony established that she had access to therapeutic resources in prison and she in fact attended some therapy groups there. She could have taken the parenting classes required under the case plan, but the timing of the parenting classes conflicted with college classes offered there. Sharon decided to enroll as a full-time college student. Sharon testified, "I thought my education was more important." Thus, the evidence established that Sharon failed to make use of the services available to her.
Furthermore, the evidence established that during the six months prior to CSB acquiring temporary custody of Shaun, the agency had worked diligently with the family to counsel both Sharon and Shaun and to resolve the discipline problems that existed. Even assuming that CSB's efforts after Sharon's incarceration fell short of "reasonable case planning and diligent efforts by the agency to assist the [parent] to remedy the problems that initially caused the child to be placed outside the home," R.C. 2151.414(E)(1), that would only negate one of the sixteen circumstances enumerated in R.C. 2151.414(E). Any one of those circumstances requires the court to find that the child cannot be placed with the parent within a reasonable time.
Sharon was incarcerated at the time of the permanent custody hearing, with an anticipated release date of August 19, 2001. Sharon testified that it would take her six to twelve months after release from prison to be in a position to care for Shaun. That would result in a reunification date of no earlier than February 19, 2002 and perhaps as late as August 19, 2002. The motion for permanent custody was filed on June 8, 2000, and the hearing took place on July 27-28, 2000, more than eighteen months prior to the anticipated reunification date. Thus, there was clear and convincing evidence that Sharon was incarcerated at the time of the permanent custody hearing, and would not be able to provide a home for Shaun for more than eighteen months after the filing of the permanent custody motion and the dispositional hearing. R.C. 2151.414(E)(12). Given this circumstance, the trial court was statutorily required to find that Shaun could not be placed with Sharon in a reasonable time. R.C.2151.414(E).
Thus, there was clear and convincing evidence that Shaun could not be returned to Sharon both because he had been in the custody of CSB for twelve months, R.C. 2151.414(B)(1)(d), and because due to Sharon's incarceration, she could not care for Shaun for more than eighteen months. See R.C. 2151.414(E) and 2151.414(B)(1)(a). Sharon's third assignment of error, that CSB had to prove by clear and convincing evidence that it had made reasonable efforts at reunification, is not well-taken, and it is overruled. Likewise, Sharon's first assignment of error, that CSB prevented Shaun from communicating with Sharon in violation of the case plan, is not supported by the evidence and it is therefore overruled.
 III.
We have overruled all three assignments of error, because we find that there was clear and convincing evidence that permanent custody was in Shaun's best interest and that Shaun could not be placed with his mother within a reasonable time. Having overruled the assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
SLABY, J., CARR, J. CONCUR